IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SAEVONE SHYQUIELLE BROWN, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:19-cv-00864 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| SERGEANT COLEMAN, ) | By: Hon. Michael F. Urbanski |
| ) | Chief United States District Judge |
| Defendant. ) | |

**MEMORANDUM OPINION**

Saevone Shyquielle Brown, a Virginia inmate proceeding pro se, filed a complaint pursuant to 42 U.S.C. § 1983 alleging that defendant Sergeant Coleman used excessive force against Brown, in violation of Brown's Eighth Amendment constitutional right to be free from cruel and unusual punishment. Coleman has filed a motion for summary judgment, denying the use of excessive force. ECF No. 14. Brown disputes Coleman's account of the events. ECF No. 18. The present record does not contain affidavits from the many correctional officers on scene, and the view provided by the pod video is inconclusive. Because the court is unable at this stage to reconcile Coleman and Brown's divergent accounts, the court finds that a genuine issue of material fact exists precluding summary judgment. As such, Coleman's motion is **DENIED.**

I.   **Factual Background**

A.   **Use of OC Spray**[1]

---

[1] The term "OC spray" is understood to refer to oleoresin capsicum spray, which is also known as "pepper spray."

1

On Monday September 23, 2019, at about 1:30 p.m., Brown was in his cell at Wallens Ridge State Prison, standing on his table with a noose, fashioned from his bed sheet, around his neck. Correctional Officer Cheeks came upon Brown making preparations to hang himself and called for assistance. Cheeks remained in front of Brown's cell door, speaking with Brown.

Three more correctional staff, including Coleman, responded to Cheeks's call for assistance. Brown alleges that he had abandoned his suicide attempt, and was standing at his cell door waiting to be cuffed when Coleman arrived. Coleman has submitted his affidavit in support of his motion, in which he describes the scene differently. Coleman avers that Brown was standing on the floor, tying a noose with his sheet, and that Brown stated he was going to hang himself and refused to come to the door. In his response, Brown reiterates that he had ended his attempt, and that he was already at his door and ready to be restrained by the time Coleman arrived. Brown maintains that there was no point at which the use of OC spray was necessary or warranted.

Both parties agree that Coleman released OC spray through the slot in Brown's door. Brown alleges this happened after Brown followed Coleman's instruction to back up from where he was standing at the door. Coleman avers, to the contrary, that Brown was preparing to commit suicide and was not complying with orders to be restrained, and that he administered the OC spray to prevent Brown from self-harm. Coleman maintains this was a half-second to one-second burst of spray.

Brown alleges two more bursts of OC spray. According to Brown, Coleman sprayed a second time when Brown presented at the door to be cuffed (after having backed away at

2

Coleman's instruction). Brown alleges a third burst of OC spray when he moved to be cuffed up. Coleman denies the second and third bursts of OC spray.

In his response, Brown describes the alleged events with greater specificity. Brown alleges that Coleman was not acting in haste or under pressure, and that Coleman had time to talk to and get a report from Cheeks, to look into the cell, put on gloves, and then remove the can from his belt and spray multiple times. Brown alleges retaliatory motive on the part of Coleman, in that Coleman was annoyed and irritated that Brown was wasting his time.

Coleman has submitted video evidence[2] which provides a limited view of the events at Brown's cell door, from a perspective some distance removed from the door. According to the court's review of the video, Coleman is understood to be the official who is positioned directly in front of Brown's door. Because of the distance of the camera from the involved cell, little can be gleaned from the video regarding Brown's location, responses to commands and the use of the OC spray. At most, it is possible to discern an orange shape at the window of Brown's cell door that comes in and out of view. The video also shows Coleman reaching for something on his belt, but the extent of OC spray administered cannot be determined from the video. According to the video, about 90 seconds elapsed between the time Coleman

---

[2] Coleman's brief indicated that counsel would arrange for Brown to view the video recordings of this incident. Brown, however, stated in his response that he had not viewed the video, and that he wished to do so. There is nothing in the record before the court confirming that Brown has been permitted to view the video recordings that were filed with the Clerk's office. Counsel shall make arrangements for Brown to securely view the video, if this has not already occurred. Counsel shall file a notice within ten days, confirming that Brown has been permitted to securely view the video that has been entered into the court's record. In any event, because the court is denying Coleman's motion for summary judgment, there is no need to further delay entry of the court's ruling.

and the other two prison officials arrived at Brown's cell, and the time Brown emerged from the cell.

**B.     After-Effects and Decontamination**

Brown was taken to another pod, where he was cleared by a nurse, given fresh clothing, and placed in a camera cell in that pod. Brown alleges he was not given a chance to properly decontaminate, and was not thoroughly checked by medical. Brown alleges he suffered burning sensations and skin irritation for three days. Brown also experienced "a mild asthma attack" on "Friday evening," which is understood to have occurred on September 27, 2019.[3] He alleges he continued to experience different side effects until he was able to thoroughly shower the following Monday (i.e., a week after the OC spray was applied).

Coleman avers that Brown was offered a shower and decontamination in the pod where Brown was taken to be stripped. Coleman avers that Brown accepted the offer.

In response, Brown maintains he was not offered decontamination. According to Brown, he asked Coleman to turn on the shower to rinse off the OC spray, but Coleman ignored the request. Also according to Brown, the showers are electronically controlled by a booth officer, and therefore Coleman would have had to direct the booth officer to turn on the shower, which Coleman did not do.

Coleman has submitted video from the second pod. The video shows Brown being escorted into the second pod by three prison officials, one of whom appears to be Coleman. According to the court's review of video from the second pod, the group escorting Brown

---

[3] Brown's medical records confirm that he suffers from asthma.

entered the second pod less than four minutes after they exited the first pod. The video shows Brown being escorted to an open stall where he took off his orange prison garb. The open stall appears to be a shower, but the orientation of the camera does not allow one to discern whether the water was turned on in the shower while Brown was in it. After a period of time in the shower stall, Brown emerged clad in a green safety smock and was escorted to another room at the side of the pod.

Brown and Coleman agree that a nurse checked Brown. Video shows two persons who are dressed differently than the other prison officials, and who appear to be medical staff, entering the pod and briefly joining the prison officials in front of the shower stall. These two staff proceed to the room at the side of the cell to which Brown was later escorted.

Brown states that he remained silent during the nurse examination, and that he "did not respond in any way good or bad." Coleman submits Brown's medical records through the affidavit of C. Collins, the Nursing Supervisor. According to his medical records, Brown was assessed by a nurse, who noted no signs of distress, and noted that Brown did not verbalize any complaints.

Brown was seen on October 8, 2019, for eye irritation which he ascribed to the OC spray. He did not report visual disturbances. He was referred to the doctor. He was seen by a doctor on October 16, 2019, but there is no mention of the eye irritation. Rather, the doctor prescribed treatment for dandruff and dry skin.

## II. Legal Standards

### A. Motion for Summary Judgment

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 24-48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 930 (4th Cir. 1990) (quoting Anderson, 377 U.S. at 249-40). The court must determine whether the evidence "'presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (citing and quoting Anderson, 477 U.S. at 255, 251-52) (internal quotation marks omitted).

**B.     Liability under § 1983**

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish that he has been deprived of a right, privilege or immunity secured by the

Constitution or laws of the United States and that the conduct about which he complains was committed by a person acting under color of state law. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998); see also Conner v. Donnelly, 42 F.3d 220, 223 (4th Cir. 1995). "Liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights. The doctrine of respondeat superior has no application under [§ 1983]." Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Bennett v. Gravelle, 323 F. Supp. 203, 214 (D. Md. 1971)); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

**C.      Eighth Amendment Excessive Use of Force**

The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain" through the use of excessive force. Parker v. Stevenson, 625 Fed.App'x 196, 198 (4th Cir. 2015) [internal quotation marks and citation omitted]. There is both a subjective and an objective component to the excessive use of force analysis. Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008).

"The more demanding part of the test [] is the subjective component, which asks a single question: whether the officers acted with a sufficiently culpable state of mind." Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021) (citing and quoting Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996)). The question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Iko, 535 F.3d at 239 (citing and quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). The court should consider four nonexclusive factors in evaluating the subjective component of the analysis:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably

7

> perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

Id. [internal quotation marks and citation omitted].

As for the objective component of the excessive use of force analysis, it is incorrect to focus on whether an inmate shows more than de minimis injury from use of pepper spray. Dean, 984 F.3d at 303. Rather, the inquiry is "what is the severity of the *force* employed." Id. [emphasis in original]. Any use of force that is more than de minimis will satisfy the objective component of the excessive use of force analysis, "regardless of the extent of the injury." Id. Application of pepper spray for two to three seconds is more than de minimis, and is sufficient to support an excessive use of force claim. Id. (citing Greene v. Forster, 733 Fed. App'x 80, 81-82 (4th Cir. 2018)). The Fourth Circuit Court directs that use of products such as mace should be closely scrutinized because of their inherently dangerous characteristics capable of causing "serious and perhaps irreparable injury." Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) [internal quotation marks and citation omitted].

Even if an initial administration of pepper spray is warranted, continued use of the spray after a prisoner is compliant, and after a reasonably perceived threat has receded, could support a reasonable jury's finding of an Eighth Amendment violation. Iko, 535 F.3d at 239-40. A prison official's use of force, through the application of pepper spray, may constitute "wanton punishment" in violation of the Eighth Amendment, "even if force appropriately might have been used just a few seconds earlier," but the circumstances have already calmed. Dean, 984 F.3d at 311. "[O]nce the justification for the use of force has expired, any additional force may be deemed 'malicious' and hence unconstitutional[.]" Id.

8

Conflicting accounts regarding as to whether use of pepper spray was justified may preclude entry of summary judgment. Dean, 984 F.3d at 304-305 (finding question whether officer's use of pepper spray was clearly necessary was a sharply contested question of fact; viewing the contested facts in the light most favorably to the inmate, a reasonable jury could find he was pepper-sprayed only after any threat to safety had passed); Taylor v. Long, 483 Fed. App'x 855, 857-58 (4th Cir. 2012) (a reasonable fact-finder might resolve factual dispute as to whether inmate was complying with directions, and whether use of pepper spray was necessary, in inmate's favor). A refusal to permit an inmate to decontaminate within a reasonable time after being sprayed, may constitute an Eighth Amendment violation. Mann v. Failey, 578 Fed. App'x 267, 273-74 (4th Cir. 2014). Factual disputes as to whether an inmate requested decontamination, or whether the inmate was instead offered decontamination but refused, may create a genuine issue of material fact precluding entry of summary judgment. Id. at 274; Mobley v. Mallow, 2020 WL 5747188, at *7 (D. Md. Sept. 25, 2020.

### III. Discussion

Viewing the disputed material facts in the light most favorable to Brown, there are genuine issues which preclude entry of summary judgment in favor of Coleman. Brown and Coleman offer two very different accounts as to what Brown was doing in his cell at the time the OC spray was administered. Coleman's affidavit states:

> When I arrived at the cell, Brown was standing on the floor tying a noose with his sheet. Brown stated that he was going to hang himself and refused to come to the door to be restrained. As Brown appeared to be preparing to commit suicide and he was not complying with orders to be restrained, I opened the tray slot and administered a half second to one second burst of OC spray from the MK-4 to Brown to prevent self-harm. After I sprayed

9

> Offender Brown once, he complied with my order to present himself to be restrained.

Aff. of J. Coleman, ECF No. 15-2, at ¶ 4.

Brown disagrees, stating that Officer Cheeks had already prevented his suicide attempt and that he was no longer tying the noose and trying to hang himself. Brown Resp. to Roseboro Notice, ECF No. 18, at 1. Brown denies that he refused to comply with Coleman's order to present himself at the door to be restrained. Brown states that "I was in compliance and at my door waiting to be restrained prior to the arrival of Sergeant Coleman. It was Sergeant Coleman who ordered me to step back from the door, and when I did, he opened my tray slot and sprayed me three times." Id. at 2-3.

The video evidence is insufficient, in and of itself, to resolve this dispute in the two accounts. Of significance, although there were multiple correctional officers other than Coleman on scene outside Brown's cell door, none of them have supplied affidavits. As such, the court is required to conclude on this record that a genuine issue of material fact exists as to the circumstances leading up to Coleman's administration of the OC spray. Further, even if the first burst of OC spray is found to be justified, on this record there are also genuine issues as to whether Coleman administered two more bursts of OC spray, and if so, whether additional administration of OC spray was warranted.

Brown's claim that he was not offered a shower for decontamination appears far-fetched based on the video evidence that he was taken to what appears to be a shower stall, took off his orange clothes, remained in the stall for several minutes, and put on a green safety smock. For his part, while Brown concedes that he was taken to a shower area and given a

10

safety smock, he denies that the water was turned on. Again, although there were multiple other correctional officers outside the shower area, none of them filed affidavits.

An inmate who is denied decontamination for a period of days, or even hours, may have stated an Eighth Amendment claim. Mann, 578 Fed. App'x at 270, 274-75 (prisoner's request for shower was denied, and he was not decontaminated from chemicals for five days). A similar dispute was addressed in Mobley, 2020 WL 5747188, at *7, where the prisoner alleged that he was denied a decontamination shower, whereas the correctional officer claimed that the prisoner had refused an offer for a shower. The prisoner's allegation was more conclusory than Brown's allegation here, in that the prisoner in Mobley did not specify when and where he asked for a shower. Nevertheless, the prisoner in Mobley had sufficiently created a genuine issue of material fact, to survive summary judgment. Id.; see also Murphy v. Ott, 2018 WL 1513007, at *7 (D. Md. Mar. 26, 2018) (prisoner created genuine issue of material fact with allegation he was placed in a cell without running water for several hours after a pepper spray event). Unlike the prisoner in Mobley, Brown has described the shower request he posed to Coleman. Brown has further alleged that he was not able to properly decontaminate until a week after the OC spray event. Brown has presented sufficient grounds, demonstrating sufficient disagreement, to require that the question of decontamination be resolved by a factfinder.

**IV. Conclusion**

For the foregoing reasons, the present record is insufficient to allow the court to resolve the disputed issue of material fact regarding the use of OC spray and decontamination

efforts. As such, the court **DENIES** defendant Coleman's motion for summary judgment, ECF No. 14.

An appropriate order will be entered.

Entered: September 3, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.09.03 11:58:46
-04'00'

Michael F. Urbanski
Chief United States District Judge